UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KERWIN D. SCOTT, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 4:14-cv-01853-JAR |
| JERRY W. MORGAN, et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment filed February 26, 2016 (Doc. 65). On March 18, 2016, Plaintiff submitted a response in opposition to Plaintiffs' Motion for Summary Judgment with supporting exhibits (Doc. 67-68 & Attach.). Defendants filed their reply on March 28, 2016 (Docs. 71-73). The motion is fully briefed and ready for disposition. For the following reasons, the motion will be granted.

**I. Background**

On November 3, 2014, Scott, a Missouri inmate, filed this action under 42 U.S.C. § 1983, seeking damages against Defendants Tina Coffman, a nurse assigned to the administrative segregation unit at the Eastern Reception, Diagnostic and Correctional Center (ERDCC); David Mullen, a physician at ERDCC; and Shanta Pribble, the ERDCC Health Service Administrator. Scott claims that Defendants, with deliberate indifference, provided him constitutionally inadequate medical care for a fractured clavicle he suffered during a "use of force incident" involving ERDCC corrections officials (Doc. 1). The summary judgment evidence establishes the following. On November 24, 2012, Scott--while housed in the ERDCC administrative segregation unit--was involved in a "use of force incident" during which corrections officers

took him to the ground and sprayed pepper spray in his face. Less than thirty minutes later, Coffman responded to determine whether Scott could be monitored safely in administrative segregation, or should instead be transferred to the infirmary. Coffman observed Scott through the window of his cell door. Scott complained that his eyes were burning, that he was having difficulty breathing, and that he thought his right shoulder was dislocated. Coffman noted in Scott's medical records that he had a history of chronic obstructive pulmonary disease (COPD), that she had assessed his shoulder area, that his shoulder range of motion was limited by pain, that the area was symmetrical with his left shoulder, and that she observed no swelling, bruising, or redness. Coffman telephoned a non-defendant physician to discuss Scott's history of COPD, and the physician determined that Scott could be observed safely in administrative segregation. Coffman then instructed Scott to notify the medical department immediately if he experienced any shortness of breath or difficulty breathing, or if his shoulder pain worsened (Docs. 66.1 at 5, 7; 66.2 at 4-9; 66.3 at 13-15). During her deposition, Coffman testified that she could not remember whether she informed the physician of Scott's shoulder complaints during the November 24, 2012 telephone call, but that she was "far more concerned with his respiratory status than any other injury that he was saying he had at [that] time" (Doc. 66.3 at 13-14).

Approximately ten hours later, Scott self-declared a medical emergency, reporting chest pains, hyperventilation, and excruciating shoulder pain (Doc. 66.1 at 6). When a non-defendant nurse responded, Scott stated "my shoulder, my shoulder" (Doc. 66.2 at 6-8). During his deposition, Scott testified that, by this time, he was suffering shoulder pain at a level of "ten plus" on a scale of one to ten, and that his shoulder area was bruised and swollen. The nurse took Scott's vitals, did not examine his shoulder, informed him that he would not be transported to the emergency room, told him that an x-ray would not be available immediately, as it was the

weekend, submitted a referral for an shoulder x-ray, and advised Scott to submit a medical service request (MSR) if his shoulder was in pain (Docs. 66.1 at 6-7; 66.2 at 6-8). The nurse also erroneously noted in Scott's medical record that Scott was already taking pain medication (Doc. 66.2 at 8). Later the same day, Scott filed a MSR, indicating that his shoulder had been injured during the use-of-force incident, that it needed to be x-rayed, that he was unable to move it, that he could not lay on it, that it felt like it was broken, and that it was large, swollen, and had a knot or bump on it (Doc. 67.3 at 7-8).

On November 26, 2012, Coffman received Scott's November 24 MSR as well as five other MSRs he had submitted, including one in which he requested a renewal of Tramadol, a narcotic pain medication he had been taking prior to his injury for unrelated complaints (Docs. 66.2 at 8-9; 67.3 at 7-8). As relevant, she spoke with Dr. Mullen, who ordered an x-ray of Scott's shoulder; she entered an order for a shoulder x-ray; and she referred Scott's Tramadol-request to doctor sick call (Docs. 66.2 at 9; 66.3 at 16). Also on November 26, 2012, Scott submitted another MSR, complaining of "extreme pain [and] discomfort" in his right shoulder, and stating that it felt "like it [was] broken or dislocated" (Doc. 67.3 at 9). In response to this second MSR, Coffman noted that an x-ray had already been ordered (Docs. 66.3 at 17-18; 67.3 at 9).

Scott's shoulder was x-rayed on November 30, 2012, and the x-ray film was mailed to a radiologist for interpretation (Doc. 66.2 at 10). Dr. Mullen received the radiologist's interpretation--which diagnosed a displaced fracture of the clavicle--on December 5, 2012 (Id. at 10, 91). On December 10, 2012, Scott submitted an informal resolution request (IRR), stating that the he believed the medical department was refusing to provide him adequate treatment for his shoulder injury, that his shoulder was still swollen, that he was in excruciating pain, that "a bone [was] sticking up as if it [was] either broken or dislocated," and that he still had not been

3

assessed by Dr. Mullen or provided any sort of pain medication (Doc. 67.3 at 3, 13-17). On December 19, 2012, Scott's sister contacted Pribble, expressing concern about the adequacy of the medical care Scott was receiving for his shoulder injury based on her own observations of his condition during a recent in-person visit, and Pribble informed her that Scott was scheduled for an appointment with Dr. Mullen on December 21, 2012 (Doc. 66.2 at 15).

On December 21, 2012, Dr. Mullen examined Scott's shoulder injury for the first time (Docs. 66.2 at 14). He observed a large callous (bony formation) on the distal one-third of Scott's clavicle, that Scott had near-normal passive range of motion in his shoulder, and that Scott's shoulder was tender to palpation with no crepitus (noise caused by the edges of a fracture grinding together). Dr. Mullen determined that Scott's clavicle fracture was healing, ordered another x-ray, and prescribed ibuprofen to be taken four times per day as needed for pain (Id. at 14-15; Doc. 66.2 at 97-99). Dr. Mullen noted in Scott's medical record that "custody issues in [Scott's] wing" had prevented him from examining Scott sooner, and that he had thus treated Scott conservatively in the interim (Doc. 66.2 at 14). During his deposition, Dr. Mullen testified that "scheduling issues" caused the 16-day delay until he examined Scott after he received the radiologist's report, and that Scott's request for a renewal of his Tramadol prescription had been referred to Jefferson City for approval, which a Missouri Department of Corrections ("MDOC") policy required, on November 26, 2012 (Doc. 66.4 at 13-15).

On December 28, 2012, Scott filed a third MSR relating to his shoulder, reporting that the second x-ray of his shoulder had not yet been taken (Doc. 67.3 at 10-11). A second x-ray of Scott's shoulder was taken on February 1, 2013, and the films were again mailed to a radiologist for interpretation. Dr. Mullen received the radiologist's interpretation on February 6, 2012. According to the radiologist, a comparison of Scott's x-rays showed a "persistent separated

4

fracture of the right clavicle" with "no evidence of approximation that would allow for healing" (Docs. 66.2 at 19-20; 66.4 at 18). On February 11, 2012, Dr. Mullen requested an orthopedic consultation (Doc. 66.2 at 21).

Scott was then transferred to another prison, and over the next several months, underwent three surgeries to repair his clavicle. Dr. Galbraith, who performed the first surgery, initially assessed Scott, via teleconference consultation, on February 28, 2013. Dr. Galbraith gave Scott the options of continued observation, medication, and physical therapy, or surgery. Scott chose surgery, telling Dr. Galbraith his shoulder was "hurting real bad," that "it wasn't healing," and that he "was tired of the pain." (Doc. 66.6 at 6-8, 15). Dr. Galbraith performed Scott's first shoulder surgery in mid-March 2013, installing a metal plate to stabilize the fracture and grafting bone from Scott's hip (Id. at 9). By August 2013, it was apparent that Scott's shoulder was not healing, and Dr. Galbraith referred him to Dr. Crist, another orthopedic surgeon (Docs. 66.6 at 11; 66.7 at 7).

Dr. Crist then performed two additional surgeries on Scott's shoulder. During Scott's second surgery, Dr. Crist removed the hardware Dr. Galbraith had installed, removed additional bone and scar tissue at the fracture site, and placed an antibiotic-infused bone-cement spacer (Doc. 66.7 at 10). During Scott's third surgery, Dr. Crist removed the bone-cement spacer, installed new hardware, and placed a bone graft (Id. at 11). Dr. Crist is of the opinion that Scott's continuing shoulder pain is related more to his injury, the three surgeries, and a delay in initiating his post-operative physical therapy. He also opines that patients with clavicle fractures should be provided arm slings as a comfort measure, but that slings do not keep the clavicle in place to promote healing (Id. at 6-7, 14). In his opinion, motion at the site of a clavicle fracture, caused by a patient moving his arm, could be a potential cause of non-healing, but that there are a

5

number of factors that can cause clavicle fractures not to heal, and that he could not know for certain what prevented Scott's fracture from healing on its own (Doc. 66.7 at 5-9, 12-14).

Drs. Mullen, Galbraith, and Crist all agree that the standard of care for fractured clavicles includes ice for the first 24 to 48 hours, immobilization of the arm and shoulder using a sling or harness, pain medication, and possibly surgery (Docs. 66.4 at 9-10; 66.6 at 5-6, 11-12, 15; 66.7 at 5-7, 9, 13-14). They also agree that most clavicle fractures heal on their own, and that it is a medically acceptable practice to treat such fractures conservatively for several weeks or months to ascertain whether they will heal without surgical intervention (Docs. 66.4 at 9-12; 66.6 at 9; 66.7 at 6). According to Dr. Mullen, he did not provide Scott an arm sling because, at the time he was treating him, he was under the mistaken belief that inmates in administrative segregation were not permitted to have arm slings (Doc. 66.4 at 9-10).

## II. Summary Judgment Standard

The Court may grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Peterson v. Kopp, 754 F.3d 594, 598 (8th Cir. 2014). A moving party bears the burden of informing the Court of the basis of its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine

6

whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

### III. Deliberate Indifference Standard

Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. Nelson v. Corr. Med. Servs., 583 F.3d 522, 531-32 (8th Cir. 2009) (citing Estelle v. Gamble, 429 U.S. 97 (1976)). To establish deliberate indifference, Scott "must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." Id. The second prong of the deliberate-indifference test requires Scott to show that Defendants were more than negligent, or even grossly negligent; he must show that their mental state was "akin to criminal recklessness." Allard v. Baldwin, 779 F.3d 768, 771-72 (8th Cir. 2015). Scott may show that Defendants were deliberately indifferent to his serious medical needs by establishing that they totally deprived him of medical care, and that the deprivation resulted in "pain and suffering" or "a lingering death." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010).

### IV. Discussion

There is no real dispute that Scott's broken clavicle was a serious medical need. Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998) ("There is no doubt that plaintiff had a serious medical need. His hand had been broken."); Hightower v. City of St. Louis, No. 4:14-cv-1959, 2015 WL 3891821, at *2 (E.D. Mo. 2015) (shoulder fractured in two places constituted objectively serious medical need). Thus, the dispositive issue in this case is whether Defendants were deliberately indifferent to Scott's fractured clavicle and the pain it caused him. As such, to

7

be entitled to summary judgment, Defendants must establish that there is no genuine dispute as to the constitutional adequacy of the medical treatment they provided Scott for his shoulder injury and their management of the pain it caused him. Celotex, 477 U.S. at 323.

### A. Defendant Pribble

Health Services Administrator Pribble argues that she is entitled to summary judgment because, as an administrator, she was not personally involved in Scott's medical care, and because she cannot be held liable on a theory of respondeat superior. She also contends that she was not deliberately indifferent to Scott's serious medical need, because once she learned of his injury--during her December 19, 2012 conversation with his sister--she confirmed that Scott had a December 21, 2012 appointment with Dr. Mullen (Doc. 66). In response, Scott argues that Pribble had direct knowledge of Scott's injury and the lack of treatment he was being provided. More specifically, he notes that, even after she learned of his condition, Pribble took no action to ensure that he received adequate treatment (Doc. 67 at 14-15).

Prison supervisors cannot be held liable under § 1983 on a respondeat superior theory, Langford, 614 F.3d at 460. They can, however, incur liability where they are personally involved in a constitutional violation, or where their corrective inaction amounts to deliberate indifference to or tacit authorization of their subordinates' violative practices. Id. (citing Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993). Prison officials who know that an inmate's medical needs are not being adequately treated, but remain indifferent, may be held personally liable. Id. at 460-61. The undisputed evidence shows that Pribble learned of Scott's injury no earlier than December 19, 2012; that Pribble confirmed that Scott had already been scheduled for an appointment with Dr. Mullen two days later; that Dr. Mullen saw Scott and provided him pain medication during that appointment; and that Pribble was not otherwise personally involved in Scott's medical care.

The Court concludes that the undisputed facts establish that Pribble did not learn of Scott's injury until December 19, 2012; that she responded reasonably after she learned of his injury; and that she was not deliberately indifferent to Scott's serious medical needs. The Court will thus grant summary judgment in her favor.

### B. Defendants Dr. Mullen and Nurse Coffman – Treatment of the Fracture

Dr. Mullen and Coffman argue that they were not deliberately indifferent to Scott's clavicle fracture. More specifically, Coffman argues that she responded to Scott's MSRs in a timely manner, and communicated his symptoms to physicians who were authorized to make decisions regarding his care; and Dr. Mullen asserts that he initially treated Scott's injury conservatively and consistently with the standard of medical care (Doc. 66). In response, Scott contends that Dr. Mullen and Coffman were deliberately indifferent based of on their failure to provide him any treatment for his shoulder injury, even after they learned his clavicle had been fractured, until several weeks had passed (Doc. 67).

A complaint that a prison physician has been negligent in diagnosing or treating a medical condition does not give rise to a claim under the Eighth Amendment. Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008). Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Id. Rather, to establish an Eighth Amendment claim of deliberate indifference to serious medical needs, an inmate must bring forth evidence of sufficiently harmful acts or omissions. Id. Deliberate indifference entails a level of culpability equal to criminal recklessness, i.e., that the official was both aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and that the official actually drew the inference. McRaven v. Sanders, 577 F.3d 974, 982-83 (8th Cir. 2009). When a prisoner-plaintiff's deliberate-indifference claim is based on a delay in medical

treatment, the Court must measure the objective seriousness of the deprivation by reference to the effect of the delay. Jackson v. Riebold, 815 F.3d 1114, 1119-20 (8th Cir. 2016). The plaintiff must produce verifying medical evidence that establishes the detrimental effect of the delay. Id. Where an inmate submits evidence documenting his diagnosis and treatment, but offers no evidence establishing that any delay in treatment had a detrimental effect on his prognosis, the inmate fails to raise a genuine issue of fact on an essential element of his claim. Id.

The Court concludes that Dr. Mullen and Coffman were, at most, negligent in failing to provide Scott more complete treatment for his clavicle fracture. Moore v. Duffy, 255 F.3d 543, 545 (8th Cir. 2001) (mere negligence does not support constitutional violation); cf. Corwin v. City of Independence, Mo., No. 15-1732, 2016 WL 3878216, at *2 (8th Cir. July 18, 2016) (prison nurse was at most negligent when she responded to prisoner's complaint of a broken hand, examined his hand, prescribed over-the-counter pain medication, and applied an ACE bandage wrap). While the Court is troubled by the delays in performing x-rays of Scott's shoulder after the use-of-force incident, the Court nonetheless concludes that the delay did not rise to the level of deliberate indifference. Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006) (section 1983 deliberate indifference claim failed because one-month delay between nurse's tentative diagnosis of broken finger and x-ray of prisoner's hand was, at most, negligent) see also Burton v. Kastings, 595 Fed. App'x 657 (8th Cir. 2015) (unpublished per curiam), affirming No. 1:10-cv-165 (E.D. Mo. July 21, 2014) (unpublished order) (granting summary judgment in medical defendants' favor where no x-ray was performed until two months after prisoner-plaintiff's injury, and more than a month after a nurse stated that plaintiff's hand was likely fractured; concluding that medical care was at most negligent, as plaintiff was evaluated and provided pain medication shortly after his injury).

Moreover, all of Scott's doctors agree that, in the early stages, the appropriate treatment for his fracture included nothing more than ice and a shoulder sling or harness. In light of the minimal, conservative course of treatment that Scott's condition necessitated, it cannot be said that the delay in scheduling x-rays or the deprivation of treatment for Scott's fracture fell so far below the standard of care as to be akin to criminal recklessness. See Allard, 779 F.3d at 771-72. Moreover, even assuming that Dr. Mullen and Coffman's failure to provide Scott treatment for his fracture met the recklessness standard, the Court would nevertheless grant summary judgment in their favor, as Scott has adduced no verifying medical evidence that the delay in treatment detrimentally affected his prognosis. See Jackson, 815 F.3d at 1119-20; see also Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (affirming grant of summary judgment where prisoner based claim on treatment delays but did not place verifying medical evidence in the record to establish detrimental effect of delay). Although Scott believes that the delay in treatment caused his lingering shoulder symptoms, none of the medical professionals offered such an opinion. There is also no indication that Dr. Galbraith treated Scott's injury any differently than he would have had he started treating Scott sooner; to the contrary, Dr. Galbraith offered Scott a range of treatment options with which he felt comfortable, and Scott chose surgery over a continued course of more conservative treatment. See Scott v. Benson, No. C11-4055-MWB, 2016 WL 1048050, at *10 (N.D. Iowa Mar. 11, 2016) (granting summary judgment on deliberate-indifference claim because, inter alia, nothing in the record showed that plaintiff was treated differently, or more intensely, because of delay in treatment). In addition, Dr. Crist attributed Scott's continuing shoulder pain to factors other than the delay in treatment, namely, the injury itself, the three surgeries, and an apparent delay in initiating post-operative physical therapy. Accordingly, the Court finds that Dr. Mullen and Coffman are entitled to summary

judgment to the extent Scott seeks redress under § 1983 based on their failure to treat his fractured shoulder.

### C. Defendants Dr. Mullen and Nurse Coffman – Pain Management

Construing the evidence and all reasonable inferences in Scott's favor, Celotex, 477 U.S. at 331, the Court further concludes that no reasonable jury could find that Dr. Mullen and Coffman were deliberately indifferent to Scott's pain complaints, Nelson, 583 F.3d at 531-32; cf. Boretti v. Wiscomb, 930 F.2d 1150, 1154-55 (6th Cir. 1991) (failure to provide pain medication may be sufficient to support Eighth Amendment deliberate-indifference claim, even where injury otherwise heals normally). The undisputed evidence shows that Coffman responded to Scott's injury less than 30 minutes after the use-of-force incident, that she prioritized his respiratory symptoms over his complaint of a shoulder injury, and that she advised him to file an MSR if his shoulder pain worsened. The record also establishes that Coffman received Scott's first MSR and referred his request for Tramadol to doctor sick call November 26, 2012, or two days after his injury; and that Dr. Mullen then referred the pain-medication request to Jefferson City for approval, as MDOC policy required. Notably, there is no indication that Dr. Mullen or Coffman were thereafter notified that the Tramadol-request had been denied, or that Scott was not otherwise receiving pain medication. See Nelson, 583 F.3d at 531-32 (plaintiff must prove that prison official deliberately disregarded serious medical need).

This case is distinguishable from Dadd v. Anoka Cty., in which the Eighth Circuit Court of Appeals recently affirmed the denial of a motion to dismiss a pretrial detainee's claim that jail officials had been deliberately indifferent to his serious pain. No. 15-2482, 2016 WL 3563424, at *3-5 (8th Cir. June 30, 2016). In Dadd, a defendant nurse learned that the plaintiff suffered from a painful dental condition for which he had already been prescribed a narcotic pain medication,

12

communicated the plaintiff's pain complaint to a physician, and thereafter failed to administer to the plaintiff the new pain medication the physician prescribed. Id. Unlike the nurse in Dadd, Dr. Mullen and Coffman affirmatively responded to Scott's pain complaints: Coffman referred Scott's request for narcotic pain medication to doctor sick call on November 26, 2012, or two days after his injury; Dr. Mullen then referred the request to Jefferson City for approval; and nothing in the record suggests that Dr. Mullen or Coffman were thereafter notified that Scott continued to suffer from serious shoulder pain after the referral was made. Although Scott filed an IRR on December 10, 2012, there is no evidence suggesting that Dr. Mullen or Coffman knew of the IRR, and Scott did not file another MSR until December 28, 2012, a week after Dr. Mullen had already prescribed him ibuprofen for his shoulder pain. The Court therefore finds that Dr. Mullen and Coffman were at most negligent in their treatment of Scott's shoulder pain between the time of his injury and his first appointment with Dr. Mullen on December 21, 2012. See Allard, 779 F.3d at 771-72 (mere negligence does not give rise to § 1983 liability).

The Court further concludes that Dr. Mullen and Coffman are entitled to judgment as a matter of law to the extent Scott seeks relief for pain he continued to suffer after Dr. Mullen prescribed him ibuprofen on December 21, 2012. Inmates have no constitutional right to their requested course of medical treatment. Meuir v. Greene Cty. Jail Emps., 487 F.3d 1115, 1118-19 (8th Cir. 2007). Rather, prison doctors remain free to exercise their independent medical judgment. Id. To the extent Scott contends that ibuprofen was insufficient to manage his shoulder pain, the Court concludes that his claim amounts to disagreement with Dr. Mullen's treatment decision, and thus is not actionable under § 1983. Moreover, to the extent Scott claims that he was not permitted to take ibuprofen as frequently as Dr. Mullen had prescribed, he has not alleged, nor does the evidence show, that Dr. Mullen or Coffman were personally involved in

denying him any medication once it was prescribed. Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (to prevail in § 1983 claim, plaintiff must establish that defendant was personally involved in constitutional violation). The Court thus concludes that Scott has not established that Dr. Mullen and Nurse Coffman were deliberately indifferent to his shoulder pain.

## V. Conclusion

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 65) is **GRANTED**. A separate judgment will accompany this order. **IT IS FURTHER ORDERED** that Petitioner's petition for a writ of habeas corpus ad testificandum to secure his presence at trial in this matter (Doc. 81) is **DENIED as moot**.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

Dated this 25th day of July, 2016.